## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| EVANGELINE GREEN; and FATEMEH MOBINI, on her own behalf and as guardian of her minor child D.M.; individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> MANAGED CARE OF NORTH AMERICA, INC., d/b/a MCNA DENTAL, <br><br> Defendant. | Case No.  1:23-cv-22682 <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** <br><br> Related Case: 0:23-cv-61065-AHS |

Plaintiffs Evangeline Green and Fatemeh Mobini (on her own behalf and as guardian of her minor child D.M.), individually and on behalf of all others similarly situated (collectively, "the Class" or "Class Members"), complain of Defendant Managed Care of North America Inc. as follows, from personal knowledge as to Plaintiffs themselves and on information and belief based on their counsel's reasonable and diligent investigation as to all other matters. Because Defendant has exclusive knowledge of what information was compromised, Plaintiffs reserve the right to supplement these allegations with additional plaintiffs, facts, and injuries as they are discovered.

## I.   NATURE OF THE ACTION

1.       Defendant Managed Care of North America Inc. ("MCNA"), doing business as MCNA Dental, bills itself as "the largest dental insurer in the nation for government-sponsored" healthcare programs like Medicaid and the Children's Health Insurance Program. It claims to have "over 5 million members across 8 states" who "trust their smiles to MCNA." But these millions of Americans should not have trusted their personal information and medical privacy to MCNA.

2.       On March 6, 2023, MCNA belatedly detected hackers infiltrating its systems (the "Data Breach"). These unauthorized attackers intentionally compromised MCNA's systems and

made off with *700 gigabytes of data*, including Plaintiffs' and Class Members' names, addresses, dates of birth, phone numbers, email addresses, Social Security numbers, driver's license numbers, health insurance plan information and member numbers, information relating to dental care received, and bills and claims (the "Personal Information")—in short, all the information about Plaintiffs and Class Members a dental insurer and benefits manager had regarding its customers. The information relates to both adult and child members of MCNA. A well-known Russian hacking and ransomware group called "LockBit" later claimed responsibility for the Data Breach.

3.      MCNA has been minimally forthcoming about the details of the Data Breach, but it has represented to the Attorney General of Maine that in the approximately ten days during which Russian hackers roamed at large throughout its systems, the Personal Information of *nearly 9 million Americans* was quietly exfiltrated. The staggering breadth of the Data Breach demonstrates the fatal deficiencies in MCNA's data protection measures.

4.      On March 7, 2023, the LockBit hackers who looted Plaintiffs and Class Members' Personal Information from MCNA's system posted data samples from the trove of Personal Information they had stolen to the dark web and demanded MCNA pay a $10 million ransom within thirty days. When MCNA failed to do so, on April 7, 2023, LockBit put the full trove for sale on the dark web to any and all bidders:



5.      More than two months after the Data Breach, and more than a month after LockBit offered Plaintiffs' and Class Members' Personal Information for sale, MCNA notified its members that their Personal Information had been compromised.

6.      MCNA has a duty to safeguard and protect member information entrusted to it and could have prevented this theft by implementing adequate security measures.

7.      Plaintiffs and Class Members entrusted MCNA with, and allowed MCNA to gather, highly sensitive information relating to their health and other matters as part of seeking medical treatment. They did so in confidence, with the legitimate expectation that MCNA would respect their privacy and act appropriately.

8.      Trust and confidence are key components of Defendant's relationship with Plaintiffs and Class Members, as well as the public healthcare agencies with which it contracts to provide managed care services. Without that trust and confidence, Plaintiffs and Class Members would not have provided Defendant with, or allowed Defendant to collect, their most sensitive information in the first place, and public agencies would not have required beneficiaries of public benefits to do the same; Defendant was relied upon by all to keep this information secure (as Defendant is required by law to do).

9.      Plaintiffs bring this class action because Defendant collected but failed to secure and safeguard its members' valuable Personal Information, including Plaintiffs'.

10.     Nearly 9 million members had their Personal Information compromised in the Data Breach. As a result of Defendant's failure to protect the consumer information it was entrusted to safeguard, Plaintiffs and Class Members suffered a loss of the value of their Personal Information, and have been exposed to or are at imminent and significant risk of identity theft, financial fraud, and other identity-related fraud into the indefinite future.

11.     Defendant's intentional, willful, reckless, unfair, and negligent conduct—failing to prevent the breach, failing to limit its severity, and failing to detect it in a timely fashion—harmed Plaintiffs and Class Members uniformly. For this reason, Defendant should pay for monetary damages and appropriate identity theft protection services, as well as reimburse Plaintiffs for the costs caused by Defendant's substandard security practices and failure to timely disclose the same.

Plaintiffs are likewise entitled to injunctive and other equitable relief that safeguards their information, requires Defendant to improve its data security significantly, and provides independent, expert oversight of Defendant's security systems.

12.     Defendant has also been unfairly and unjustly enriched because of its improper conduct, such that it would be inequitable for it to retain the benefits conferred upon it by Plaintiffs and the Class Members. Plaintiffs, Class Members, and public agencies never would have entrusted Defendant with its members' Personal Information had they known that Defendant would permit unauthorized access to its Personal Information because of Defendant's complete and utter disregard for security safeguards and protocols. Plaintiffs would have used other providers.

## II.     <u>JURISDICTION AND VENUE</u>

13.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, there are more than 100 Class Members, and minimal diversity exists as Defendant is a citizen of Florida and at least once Class Member is a citizen of a different state.

14.     This Court has personal jurisdiction over MCNA because it is incorporated in Florida and maintains its principal place of business in this District.

15.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (c)(2), and (d) because Defendant's principal place of business is within this District and substantial parts of the events or omissions giving rise to the claims occurred in or emanated from this District.

### III.     NAMED PLAINTIFFS

#### A.     EVANGELINE GREEN

16.     Plaintiff Evangeline Green is a natural person residing in Alexandria, Louisiana. She is a citizen of Louisiana.

17.     Plaintiff Green transacted with MCNA in order to receive dental care benefits to which she is entitled.

18.     Plaintiff Green has no relationship with MCNA other than in connection with her receipt of dental care benefits.

19.     In order to receive dental care benefits, Plaintiff Green was required to and did provide her private health information to MCNA.

20.     Plaintiff Green received a notice of data breach from MCNA, dated May 26, 2023, informing her that her personal information had been impacted by the Data Breach. That notice of data breach is attached hereto as Exhibit 1.

21.     In early July 2023, Plaintiff Green received an email stating that a credit card charge she had allegedly made had not been processed successfully.

22.     Plaintiff Green had not, in fact, made the charge, and had never applied for or received the credit card on which the charge appeared.

23.     Other than the Data Breach, Plaintiff Green is aware of no other means by which unauthorized persons could have come into possession of the information required to attempt to take out credit cards in her name. She regularly takes steps to safeguard her private information while in her control.

24.     Plaintiff Green suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse of her personal information because

that information was accessed and exfiltrated by hackers. This injury was exacerbated by Defendant's delay in revealing the Data Breach.

25.     Plaintiff Green has a continuing interest in ensuring that her personal information, which remains with Defendant, is protected and safeguarded from future breaches.

**B.     FATEMEH MOBINI**

26.     Plaintiff Fatemeh Mobini is a natural person residing in Lake Mary, Florida. She is a citizen of Florida. She is the mother and natural guardian of her child D.M., a minor, with whom she resides.

27.     As D.M.'s guardian, Plaintiff Mobini transacted with MCNA in order to receive dental care benefits to which D.M. is entitled.

28.     Plaintiff Mobini has no relationship with MCNA other than in connection with D.M.'s receipt of dental care benefits.

29.     In order for D.M. to receive dental care benefits, Plaintiff Mobini was required to and did provide D.M.'s private health information to MCNA, as well as her own private information.

30.     As D.M.'s guardian, Plaintiff Mobini received a notice of data breach from MCNA, dated May 26, 2023, informing her that her family's personal information had been impacted by the Data Breach. That notice of data breach is attached hereto as Exhibit 2.

31.     Plaintiff Mobini did not receive the notice until July 7, 2023.

32.     After March 2023, Plaintiff Mobini began receiving numerous unsolicited calls and emails offering, among others, services related to a medical condition she had not publicly disclosed.

33.     Other than the Data Breach, Plaintiff Mobini is aware of no other means by which unauthorized persons could have come into possession of the information required to make

unsolicited attempts to sell her goods and services related to her medical condition. She regularly takes steps to safeguard her and her family's private information while in her control.

34.     Plaintiff Mobini and her child D.M. suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse of her personal information because that information was accessed and exfiltrated by hackers. This injury was exacerbated by Defendant's delay in revealing the Data Breach.

35.     Plaintiff Mobini has a continuing interest in ensuring that her and D.M.'s personal information, which remains with Defendant, is protected and safeguarded from future breaches.

## IV.    **DEFENDANT**

36.     Defendant MCNA is a Florida corporation with its principal place of business in Miramar, Florida.

## V.    **FACTUAL ALLEGATIONS**

### A.    **DEFENDANT'S COLLECTION OF PERSONAL INFORMATION**

37.     MCNA is large managed dental care organization that offers private insurance itself, as well as contracting with private and public insurers to manage dental benefits. It is one of America's largest dental health insurers, and claims to be "the largest dental insurer in the nation for government-sponsored Medicaid and CHIP programs."[1]

38.     MCNA claims to serve "over 5 million children and adults."[2]

39.     As part of its provision of managed care services and insurance to its members, MCNA collects huge amounts of data relating to its members, including personal details (such as

---

[1] https://www.mcna.net/en/home (last accessed July 14, 2023).
[2] MCNA, *Company Overview*, https://www.mcna.net/en/company-overview (last accessed July 14, 2023).

names, addresses, telephone numbers, Social Security numbers, and policy numbers), details of diagnosis and treatment, and details of claims made and bills received.

**B.**     **DEFENDANT'S REPRESENTATIONS ABOUT ITS ABILITY TO SECURE MEMBERS' PERSONAL INFORMATION**

40.     MCNA touts as one of its "strengths" its "ability to administer dental plans in an effective and innovative manner while safeguarding [its] members' protected health information," a "commitment" MCNA purports to "demonstrate ... through [its] actions."[3]

41.     As MCNA acknowledges, "[t]he law says MCNA has to keep [its members'] health information private." Specifically, MCNA is "required by law to maintain the privacy *and security* of [its members'] protected health information." It defines "personal health information" as including "both medical information and individually identifiable information, like your name, address, telephone number, or Social Security number."[4]

42.     MCNA claims to "protect this information in all formats including electronic ... information." MCNA does so, it represents, among other ways by "[l]imiting who may see your information" and "[t]raining [its] employees and associates about company privacy policies and procedures."[5]

43.     As for information submitted through its website specifically, MCNA likewise acknowledges "the important responsibility to protect the security of the personal information [it] collect[s] from" website users (who include MCNA members accessing its services through the various web portals on the site). MCNA promises its users that it has "security measures in place to protect the loss, misuse, and alteration of the information under our control."[6]

---

[3] MCNA, *Our Privacy Practices*, https://www.mcna.net/en/privacy (last accessed July 14, 2023).
[4] *Id.* (emphasis added).
[5] *Id.*
[6] MCNA, *Internet Privacy Statement*, https://www.mcna.net/en/privacy-statement (last accessed July 14, 2023).

### C.    __THE DATA BREACH__

44.    LockBit hackers infiltrated MCNA's systems as early as February 26, 2023. Due to MCNA's deficient security controls, they were permitted to roam at large throughout MCNA's system for approximately ten days, until March 7, 2023.

45.    The LockBit hacking group is a well-known cybersecurity threat. Just days before the Data Breach, *Wired.com* wrote of "The Unrelenting Menace of the LockBit Ransomware Gang."[7]

46.    MCNA variously claims to have discovered the Data Breach on March 6, 2023,[8] or as late as May 3, 2023.[9] In either event, by March 7, 2023, the LockBit hackers had exfiltrated all the data they desired, posting samples of the data on the dark web and demanding a $10 million ransom from MCNA.

47.    In total, LockBit claims to have stolen 700 gigabytes of data—a staggering figure. MCNA meekly describes LockBit's haul, apparently involving every single one of its members, as "some data."[10]

48.    MCNA claims to have "beg[u]n an investigation right away" and to have "quickly [taken] steps to stop" the Data Breach.[11] As noted above however, whatever efforts it took were far too little, far too late; LockBit had already taken everything it wanted.

---

[7] Wired, *The Unrelenting Menace of the LockBit Ransomware Gang* (Jan. 24, 2023) (last accessed July 14, 2023).

[8] *Notice of Data Breach*, https://response.idx.us/MCNA-Information (last accessed July 14, 2023).

[9] *Data Breach Notification* to the Attorney General of Maine, https://apps.web.maine.gov/online/aeviewer/ME/40/895b95c8-abc8-41f1-8c3f-b0415575de56.shtml (last accessed July 14, 2023).

[10] *Notice of Data Breach*, https://response.idx.us/MCNA-Information (last accessed July 14, 2023).

[11] *Id.*

49.     MCNA claims to have hired a "special team"—not further described—and to have taken steps to make its systems "even stronger than before."[12] These vague phrases do not allow Plaintiffs to form even a general notion of the nature or extent of MCNA's remedial measures, but in light of the magnitude of the Data Breach, the vulnerabilities to be remedied must have been pervasive and fundamental.

50.     After MCNA refused to pay the ransom demanded by LockBit, on April 7, 2023, the hackers freely offered all 700 GB of Plaintiffs' and Class Members' personal information for sale on the dark web. Presumably, it remains there still.

D.     **DEFENDANT'S NOTICE WAS DEFICIENT**

51.     Defendant's notices concerning the Data Breach were deficient in their content and their timing.

52.     The notices do not provide critical information, or else provide contradictory information. They do not disclose how LockBit hackers were able to get inside MCNA's systems without detection, and how they were able to exfiltrate vast amounts of data without detection. They offer contradictory information on when the Data Breach was detected.

53.     Critically, the notices do not even disclose that the hackers had demanded ransom which MCNA refused to pay, and that as a result MCNA members' private health information was for sale on the dark web.

54.     Moreover, Defendant's notices supply only broad categories of the kinds of information taken (such as "[i]nformation used to contact [its members], like first and last name, address, date of birth, phone number, email") rather than explaining precisely what Personal Information was stolen.[13]

---

[12] *Id.*
[13] *Id.*

55.     Defendant's notices also fail to explain the extent to which the unauthorized attackers were able to compromise its systems, stating vaguely that it became aware of "certain activity" that "happened without our permission."[14]

56.     Defendant was required by federal law to provide prompt notice of the Data Breach to its members, and in any event to give notice no later than 60 calendar days after its discovery. If, as MCNA has represented to its members, it detected the breach on March 6, 2023 (rather than on May 3, 2023, as it represented to the Maine Attorney General), its May 26, 2023, notice came far too late. Even if it did not discover the Data Breach until May 3, MCNA does not even attempt to explain the more than three-week delay.

57.     Indeed, Plaintiff Mobini and other Class Members did not receive notification of the Data Breach until *July 7*, making it *four months* before they could even begin to take steps to mitigate the harm caused by the Data Breach.

58.     Thus Plaintiffs and Class Members are left to their own devices in trying to understand what happened with their Personal Information, what risks they face, and the period during which their Personal Information was improperly taken.

**E.      DEFENDANT FAILED TO SAFEGUARD PERSONAL INFORMATION**

59.     Defendant failed to exercise reasonable care in protecting its members' information.

60.     Defendant has a nondelegable duty under federal law to ensure that all information it collects and stores is secure, and that any associated entities with whom it shares information maintain adequate and commercially reasonable data security practices to ensure the protection of its members' Personal Information.

---

[14] *Id.*

- 12 -

61.     Indeed, Defendant's entire business depends on its members and the public agencies with which it contracts entrusting it with its members' Personal Information, without which MCNA could not contract with public agencies to manage public benefits programs, offer private insurance, reimburse healthcare providers, or be reimbursed by public agencies.

62.     More specifically, Defendant knows that public agencies and private insureds must trust that it is keeping its members' health information private and secure. If those agencies and insureds lack trust in MCNA or know they insecurely store, safeguard, or transmit its members' personal information, then they choose a different provider for the services MCNA offers.

63.     Defendant is an entity covered by the Health Insurance Portability and Accountability Act of 1996 (HIPAA), *see* 45 C.F.R. § 160.102, and as such is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

64.     These rules establish national standards for the protection of patient information, including "protected health information," defined as "individually identifiable health information" which either "identifies the individual" or where there is a "reasonable basis to believe the information can be used to identify the individual," that is held or transmitted by a healthcare provider. *See* 45 C.F.R. § 160.103.

65.     HIPAA limits the permissible uses of "protected health information," prohibits unauthorized disclosures of "protected health information," and requires that Defendant implement appropriate safeguards for this information.

66.     HIPAA requires that Defendant provide notice of a breach of unsecured protected health information—which includes protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons (i.e., unencrypted data)—without unreasonable delay. *See* 45 C.F.R. Part 164, Subpart D ("Notification in the Case of Breach of Unsecured Protected Health Information"). "[I]n no case" shall the notice be delivered "later than 60 calendar days after discovery of a breach." 45 C.F.R. § 164.404(b).

67.     Notably, to assist a covered entity like Defendant in complying with its data security and privacy obligations, the U.S. Department of Health and Human Services (HHS) "has developed guidance and tools to assist ... in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards ... ."[15]

68.     Defendant proclaims on its website that "[o]ne of our strengths is our ability to administer dental plans in an effective and innovative manner while safeguarding our members' protected health information." Defendant insists it is "committed to complying with the requirements and standards" imposed by HIPAA and "demonstrate[s] our commitment through our actions."[16]

69.     Despite these requirements, the ample guidance HHS supplies for meeting them, and Defendant's representations, Defendant failed to implement appropriate safeguards from its members' private medical information and failed to provide a clear and timely notice of the threat to its members' information.

---

[15] *See* https://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last accessed July 14, 2023).
[16] *See* MCNA, *Our Privacy Practices*, https://www.mcna.net/en/privacy (last accessed July 14, 2023).

70.     Specifically, despite its statement that MCNA became aware of the Data Breach on March 6, 2023, no notice was given to its members until May 26, 2023, an unreasonable delay and in any event after the 60-day deadline established by HHS. Worse still, MCNA represented to the Attorney General of Maine that the Data Breach was not "Discovered" until May 3, 2023,[17] making it impossible for MCNA's members to know exactly what happened to their Personal Information and when.

71.     Moreover, MCNA failed to notify its members that hackers had attempted to ransom their Personal Information and, when MCNA refused to pay, already released the Personal Information onto the dark web.

72.     These vague and contradictory accounts of the Data Breach indicate that MCNA's systems to detect intrusion, detect unusual activity, and log and report such events were inadequate and not in compliance with industry standards.

73.     Defendant violated HIPAA by failing to:

a.      maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b.      adequately protect Plaintiffs' and Class Members' Personal Information;

c.      ensure the confidentiality and integrity of electronically protected health information created, received, maintained, or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

d.      implement technical policies and procedures for electronic information systems that maintain electronically protected health information to allow access only to those

---

[17] *See Data Breach Notifications*, https://apps.web.maine.gov/online/aeviewer/ME/40/895b95c8-abc8-41f1-8c3f-b0415575de56.shtml (last accessed July 14, 2023).

persons or software programs that have been granted access rights, in violation of 45 C.F.R. § 164.312(a)(1);

e.    implement adequate policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. § 164.308(a)(1)(i);

f.    implement adequate procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports, in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

g.    protect against reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 C.F.R. § 164.306(a)(3); and

h.    ensure compliance with the electronically protected health information security standard rules by their workforces, in violation of 45 C.F.R. § 164.306(a)(4).

74.    In addition to the HHS guidance discussed above, other federal agencies have issued recommendations and guidelines to help minimize the risks of a data breach for businesses holding sensitive data. For example, the Federal Trade Commission (FTC) has issued numerous guides for businesses highlighting the importance of reasonable data security practices, which should be factored into all business-related decision making.[18]

75.    The FTC's *Protecting Personal Information: A Guide for Business* sets forth fundamental data security principles and practices for businesses to implement and follow to protect sensitive data. Among other things, it notes that businesses should: (a) protect the personal customer information that they collect and store; (b) properly dispose of personal information that

---

[18] *See* FTC, *Start With Security: A Guide for Businesses*,
https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last accessed July 14, 2023).

is no longer needed; (c) encrypt information stored on their computer networks; (d) understand their network's vulnerabilities; and (e) implement policies to correct security problems. The FTC guidelines further recommend that businesses use an intrusion detection system, monitor all incoming traffic for unusual activity, monitor for large volumes of data being transmitted from their system, and have a response plan ready in the event of a breach.[19]

76.     Additionally, the FTC recommends that organizations limit access to sensitive data, require the use of complex passwords on networks, employ industry-tested methods for security, monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.[20]

77.     The FTC has brought enforcement actions against businesses for failing to reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.[21]

78.     Defendant was fully aware of [its] obligations to implement and use reasonable measures to protect the Personal Information of Plaintiffs and Class Members, but failed to comply with these basic recommendations and guidelines that would have prevented the Data Breach from occurring.

---

[19] *Id.*
[20] *Id.*
[21] FTC, *Privacy and Security Enforcement*, https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-security-enforcement (last accessed July 14, 2023).

F.     **PLAINTIFFS' AND CLASS MEMBERS' PERSONAL INFORMATION IS HIGHLY VALUABLE.**

79.     Defendant was or should have been aware that it was collecting highly valuable data, which has increasingly been the target of data breaches in recent years.[22]

80.     As early as 2014, the FBI alerted the healthcare industry that it was increasingly a preferred target of hackers, stating "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining Protected Health Information (PHI) and/or Personally Identifiable Information (PII)" so that these companies could take the necessary precautions to thwart such attacks.[23]

81.     Further, Cathy Allen, CEO of Shared Assessments, a cyber-risk management group, stated that "just the types of test proscribed might indicate a type of illness that you would not want employers or insurance companies to have. Thieves often steal and resell insurance data on the internet ... having other information makes the data more valuable and the price higher."[24]

82.     Personal Information is a valuable commodity to identity thieves. Compromised Personal Information is traded on the "cyber black-market." As a result of recent large-scale data breaches, identity thieves and cyber criminals have openly posted stolen credit card numbers, Social Security numbers, and other Personal Information on the dark web, making the information publicly available.[25] (As detailed above, that is just what happened to Plaintiffs' and Class Members' information here.)

---

[22] Healthcare Data Breach Statistics, HIPAA Journal, https://www.hipaajournal.com/healthcare-data-breach-statistics/ (last accessed July 14, 2023) ("Our healthcare data breach statistics clearly show there has been an upward trend in data breaches over the past 10 years.").
[23] Jim Finkle, *FBI warns healthcare firms they are targeted by hackers*, REUTERS, Aug. 20, 2014, http://www.reuters.com/article/us-cybersecurity-healthcare-fbi-idUSKBN0GK24U20140820 (last accessed July 14, 2023).
[24] *Id.*
[25] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-

83.     Healthcare data is especially valuable on the black market. According to one report, a healthcare data record may be valued at up to $250 per record, compared to $5.40 for the next highest value record (a payment card).[26]

84.     According to a *Reuters* investigation that included interviews with nearly a dozen healthcare executives, cybersecurity investigators, and fraud experts, medical data for sale on the black market "includes names, birth dates, policy numbers, diagnosis codes and billing information."[27] Fraudsters commonly use that data "to create fake IDs to buy medical equipment or drugs that can be resold, or they combine a patient number with a false provider number and file made-up claims with insurers."[28]

85.     According to Tom Kellermann, chief cybersecurity officer of cybersecurity firm Carbon Black, "[h]ealth information is a treasure trove for criminals [because] by compromising it, by stealing it, by having it sold, you have seven to 10 personal identifying characteristics of an individual."[29] For this reason, a patient's full medical records can sell for up to $1,000 on the dark web, while credit card numbers and Social Security numbers may cost $5 or less.[30]

---

selling-for-on-the-dark-web/ (last accessed July 14, 2023); McFarland et al., *The Hidden Data Economy*, at 3, https://www.mcafee.com/enterprise/en-us/assets/reports/rp-hidden-data-economy.pdf (last accessed July 14, 2023).

[26] *Hackers, Breaches, and the Value of Healthcare Data* (June 20, 2021), https://www.securelink.com/blog/healthcare-data-new-prize-hackers/ (last accessed July 14, 2023).

[27] Jim Finkle, *Your medical record is worth more to hackers your credit card*, Reuters, https://www.reuters.com/article/us-cybersecurity-hospitals/your-medical-record-is-worth-more-to-hackers-than-your-credit-card-idUSKCN0HJ21I20140924 (last accessed July 14, 2023).

[28] *Id.*

[29] Andrew Steger, *What Happens to Stolen Healthcare Data?* (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (last accessed July 14, 2023).

[30] Paul Nadrag, *Here's How Much Your Personal Information Is Selling for on the Dark Web* (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited July 14, 2023).

86.     As noted by Paul Nadrag, a software developer for medical device integration and data technology company Capsule Technologies:

> The reason for this price discrepancy—like any other good or service—is perceived value. While a credit card number is easily canceled, medical records contain a treasure trove of unalterable data points, such as a patient's medical and behavioral health history and demographics, as well as their health insurance and contact information. Once records are stolen, cybercriminals often tap into members of a criminal network on the dark web experienced in drug trafficking and money laundering who are eager to buy medical records to support their criminal activities, such as illegally obtaining prescription medications, filing bogus medical claims or simply stealing the patient's identity to open credit cards and fraudulent loans.[31]

G.      **DEFENDANT HARMED PLAINTIFFS AND CLASS MEMBERS BY ALLOWING ANYONE TO ACCESS THEIR PERSONAL INFORMATION.**

87.     Defendant knew or should have known both that medical information is incredibly valuable to hackers and that health care data breaches are on the rise. Accordingly, Defendant was on notice for the harms that could ensue if they failed to protect its members' data.

88.     Given the sensitive nature of the Personal Information stolen in the Data Breach—including Social Security numbers, dates of birth, driver's license numbers, financial account information, health insurance policy numbers, Medicaid or Medicare IDs, and health information, such as treatment and diagnosis information—hackers have the ability to commit identity theft, financial fraud, and other identity-related fraud against Plaintiffs and Class Members now and in the indefinite future.

89.     After MCNA refused to pay the hackers' ransom, Plaintiffs' and Class Members' Personal Information was put up for sale on the dark web.

---

[31] *Industry Voices—Forget credit card numbers. Medical records are the hottest items on the dark web* (Jan. 26, 2021), https://www.fiercehealthcare.com/hospitals/industry-voices-forget-credit-card-numbers-medical-records-are-hottest-items-dark-web (last visited July 14, 2023).

90.     Plaintiffs and Class Members have already experienced harms as the result of the Data Breach, including, but not limited to, identity theft, financial fraud, tax fraud, unauthorized lines of credit opened in their names, medical and healthcare fraud, and unauthorized access to their bank accounts. Plaintiffs and Class Members have also spent time, money, and effort dealing with the fallout of the Data Breach, including purchasing credit protection services, contacting their financial institutions, checking credit reports, and spending time and effort searching for unauthorized activity.

91.     The Personal Information exposed in the Data Breach is highly coveted and valuable on underground or black markets—and information tied to this Data Breach has already been offered for sale.

92.     Identity thieves can use the stolen information to: (a) create fake credit cards that are used to make purchases as if they were the real credit cards; (b) reproduce stolen debit cards and use them to withdraw cash from ATMs; (c) commit immigration fraud; (d) obtain a fraudulent driver's license or ID card in the victim's name; (e) obtain fraudulent government benefits; (f) file a fraudulent tax return using the victim's information; (g) commit medical and healthcare-related fraud; (h) access financial accounts and records; or (i) commit any number of other frauds, such as obtaining a job, procuring housing, or giving false information to police during an arrest. Further, loss of private and personal health information can expose the victim to loss of reputation, loss of employment, blackmail, extortion, and other negative effects.

93.     While federal law generally limits an individual's liability for fraudulent credit card charges to $50, there are no such protections for a stolen medical identity. According to a 2015 survey on medical identity theft conducted by the Ponemon Institute, victims of medical identity

theft spent an average of $13,500 in out-of-pocket costs to resolve the crime.[32] Frequently, this information was used to obtain medical services or treatments (59%), obtain prescription drugs (56%), or receive Medicare and Medicaid benefits (52%).

94.     According to the Ponemon study, "[t]hose who have resolved the crime spent, on average, more than 200 hours on such activities as working with their insurer or healthcare provider to make sure their personal medical credentials are secured and can no longer be used by an imposter and verifying their personal health information, medical invoices and claims and electronic health records are accurate."[33]

95.     Additionally, the study found that medical identity theft can have a negative impact on reputation as 45% of respondents said that medical identity theft affected their reputation mainly because of embarrassment due to disclosure of sensitive personal health conditions, with 19% responding that they missed out on employment opportunities as a result.[34]

96.     Exacerbating the problem, victims of medical identity theft oftentimes struggle to resolve the issue because HIPAA regulations require the victim to be personally involved in the resolution of the crime.[35] In some cases, victims may not even be able to access medical records using their personal information because they include a false name or data points taken from another person's records. Consequently, only 10% of medical identity theft victims responded that they "achiev[ed] a completely satisfactory conclusion of the incident."[36]

---

[32] *Ponemon Institute*, *Fifth Annual Study on Medical Identity Theft*, https://static.nationwide.com/static/2014_Medical_ID_Theft_Study.pdf?r=65 (last accessed July 14, 2023).
[33] *Id.* at 2.
[34] *Id.* at 14.
[35] *Id.* at 1.
[36] *Id.*

97.     Moreover, it can take months or years for victims to even discover they are the victim of medical-related identity theft or fraud given the difficulties associated with accessing medical records and healthcare statements. For example, the FTC notes that victims may only discover their identity has been compromised after they:

- Receive a bill for medical services they did not receive;

- Get contacted by a debt collector about medical debt they do not owe;

- See medical collection notices on their credit report that they do not recognize;

- Find erroneous listings of office visits or treatments on their explanation of benefits;

- Receive information from their health plan that they have reached their limit on benefits; or

- Are denied insurance because their medical records show a condition they do not have.[37]

98.     Other types of medical fraud include "leveraging details specific to a disease or terminal illness, and long-term identity theft."[38] According to Tom Kellermann, "[t]raditional criminals understand the power of coercion and extortion. By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[39] Long-term identity theft occurs when fraudsters combine a victim's data points, including publicly-available information or data points exposed in other data breaches, to create new identities, open false lines of credit, or commit tax fraud that can take years to remedy.

---

[37] *FTC, Medical Identity Theft FAQs for Health Care Providers and Health Plans*, https://www.ftc.gov/system/files/documents/plain-language/bus75-medical-identity-theft-faq-health-care-health-plan.pdf (last accessed July 14, 2023).
[38] Steger, *What Happens to Stolen Healthcare Data?* (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (last accessed July 14, 2023).
[39] *Id.*

99.     As explained further by the FTC, medical identity theft can have other serious consequences:

> Medical ID thieves may use your identity to get treatment – even surgery – or to bilk insurers by making fake claims. Repairing damage to your good name and credit record can be difficult enough, but medical ID theft can have other serious consequences. If a scammer gets treatment in your name, that person's health problems could become a part of your medical record. It could affect your ability to get medical care and insurance benefits, and could even affect decisions made by doctors treating you later on. The scammer's unpaid medical debts also could end up on your credit report.[40]

100.    According to a 2023 study, the costs incurred by data-breach victims are "real and substantial, and can persist for years after a breach occurs."[41]

101.    The authors examined a 2012 breach of tax records from the South Carolina Department of Revenue, which included "Social Security numbers and complete tax returns— information that swindlers could use to open new bank or credit-card accounts or borrow money in victims' names," similar to the Social Security numbers and billing information that was taken in the Data Breach here. A "substantial portion of South Carolina's population" was affected by the breach.[42]

102.    The authors found that, controlling for various demographic and economic factors, South Carolina residents faced substantial costs as a likely result of the breach. Mortgage

---

[40] *Medical ID Theft: Health Information for Older People*, Federal Trade Commission, https://web.archive.org/web/20201019075254/https://www.consumer.ftc.gov/articles/0326-medical-id-theft-health-information-older-people (last accessed July 14, 2023).

[41] Min-Seok Pang & Anthony Vance, *Your Personal Data Has Been Stolen. Will It Really Cost You Anything?*, Wall Street Journal (June 6, 2023), https://www.wsj.com/articles/personal-data-stolen-what-cost-you-f0c8e6a1 (last accessed July 14, 2023) (discussing results of Min-Seok Pang & Anthony Vance, *Breached and Denied: The Cost of Data Breaches on Individuals as Mortgage Application Denials* (forthcoming)), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4451577 (last accessed July 14, 2023).

[42] *Id.*

application denials rose by 4 percent in the four years following the breach (compared to 1.6 percent increases in two comparator states, Georgia and North Carolina). Loan amounts rose by $1,095 (compared to $437 in Georgia and North Carolina). Reported incidents of wire fraud rose by 20 percent (compared to 7 percent in all other states). Consumer complaints about credit cards and credit reporting likewise saw larger jumps than in other states.[43]

103.    As the result of the wide variety of injuries that can be traced to the Data Breach, Plaintiffs and Class Members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

      a.    losing the inherent value of their Personal Information;

      b.    identity theft and fraud resulting from the theft of their Personal Information;

      c.    costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

      d.    costs associated with purchasing credit monitoring, credit freezes, and identity theft protection services;

      e.    unauthorized charges and loss of use of and access to their financial account funds and costs associated with inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit;

      f.    lowered credit scores resulting from credit inquiries following fraudulent activities;

      g.    costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including discovering fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposing withdrawal and purchase limits on compromised accounts; and

      h.    the continued imminent and certainly impending injury flowing from potential fraud and identify theft posed by their Personal Information being in the possession of one or many unauthorized third parties.

---

[43] *Id.*

104.    Plaintiffs and Class Members place significant value in data security. According to a recent survey conducted by cyber-security company FireEye, approximately 50% of consumers consider data security to be a main or important consideration when making purchasing decisions and nearly the same percentage would be willing to pay more in order to work with a provider that has better data security. Likewise, 70% of consumers would provide less personal information to organizations that suffered a data breach.[44]

105.    Because of the value consumers place on data privacy and security, companies with robust data security practices can command higher prices than those who do not. Indeed, if consumers did not value their data security and privacy, Defendant would have no reason to tout its data security efforts to their public and private clients.

106.    Consequently, had public agencies and private insureds known the truth about Defendant's data security practices—that they did not adequately protect and store their Personal Information—they would not have entrusted MCNA's members' Personal Information to Defendant.

**H.    HACKERS SOLD PLAINTIFFS' AND CLASS MEMBERS' PERSONAL INFORMATION ON THE DARK WEB.**

107.    Following the Data Breach, the exfiltrated Personal Information was available for purchase on the dark web.

108.    Specifically, the LockBit hackers released the Personal Information for sale on April 7, 2023—nearly *two months* before MCNA gave notice of the Data Breach.

---

[44] FireEye, *Beyond the Bottom Line: The Real Cost of Data Breaches* (May 2016), https://www2.fireeye.com/rs/848-DID-242/images/rpt-beyond-bottomline.pdf (last visited July 14, 2023).

109.     Given the value of the Personal Information as described above, it is highly likely that, in the three months and more since the Data Breach, some or all Plaintiffs' and Class Members' Personal Information has already been purchased.

## CLASS ALLEGATIONS

### I.     CLASS DEFINITIONS

110.     Plaintiffs reserve the right to modify or amend the definitions below before the Court determines whether certification is appropriate.

#### A.     NATIONWIDE CLASS

111.     Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), as applicable, and (c)(4), Plaintiffs seek certification of the following nationwide class (the "Nationwide Class" or the "Class"):

> All natural persons residing in the United States whose Personal Information was compromised in the Data Breach.

112.     The Nationwide Class asserts claims against Defendant for negligence (Count 1), negligence *per se* (Count 2), breach of implied contract (Count 3), breach of confidence (Count 4), and unjust enrichment (Count 5).

#### B.     LOUISIANA SUBCLASS

113.     Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), as applicable, and (c)(4), Plaintiff Green seeks certification of statutory claims under her state's laws, on behalf of a Louisiana Subclass defined as follows:

> All natural persons residing in the State of Louisiana whose Personal Information was compromised in the Data Breach.

114.     The Louisiana Subclass asserts claims against Defendant for breach of Louisiana's data breach notification law (Count 6).

### C.    **FLORIDA SUBCLASS**

115.    Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), as applicable, and (c)(4), Plaintiff Mobini seeks certification of statutory claims under her state's laws, on behalf of a Florida Subclass defined as follows:

> All natural persons residing in the State of Florida whose Personal Information was compromised in the Data Breach.

116.    The Florida Subclass asserts claims against Defendant for deceptive trade practices (Count 7).

### D.    **EXCLUSIONS**

117.    Excluded from each Class and Subclass definitions above are Defendant, any entity in which Defendant has a controlling interest, and any of Defendant's officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class and Subclasses are any judicial officer presiding over this matter, members of their immediate family, and members of their judicial staff.

## II.    **THE PROPOSED CLASSES MEET THE REQUIREMENTS OF RULE 23.**

118.    **Numerosity. Federal Rule of Civil Procedure 23(a)(1)**. The members of each Class and Subclass are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, Defendant has represented to the Attorney General of Maine that 8,923,662 persons are affected by the Data Breach. Those individuals' names and addresses are available from Defendant's records, and Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods. Joinder of all Class Members is impracticable.

119. **Commonality. Fed. R. Civ. P. 23(a)(2) and (b)(3).** Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual Class Members. The common questions include:

      a.    Whether Defendant had a duty to protect Personal Information;

      b.    Whether Defendant failed to take reasonable and prudent security measures;

      c.    Whether Defendant was negligent in failing to implement reasonable and adequate security procedures and practices;

      d.    Whether Defendant's security measures to protect its systems were reasonable in light known legal requirements;

      e.    Whether Defendant's efforts (or lack thereof) to ensure the security of its members' Personal Information were reasonable in light of known legal requirements;

      f.    Whether Defendant's conduct constituted unfair or deceptive trade practices;

      g.    Whether Defendant violated state law when it failed to implement reasonable security procedures and practices;

      h.    Which security procedures and notification procedures Defendant should be required to implement;

      i.    Whether Defendant violated state consumer protection and data breach statutes in connection with the actions described herein;

      j.    Whether Defendant failed to notify Plaintiffs and Class Members as soon as practicable and without delay after the Data Breach was discovered;

k.      Whether Defendant breached an implied term of its agreement with Plaintiffs and Class Members by failing to implement reasonable security procedures and practices;

l.      Whether Defendant's conduct, including its failure to act, resulted in or was the proximate cause of the Data Breach and/or the loss of the Personal Information of Plaintiffs and Class Members;

m.      Whether Plaintiffs and Class Members were injured and suffered damages or other losses because of Defendant's failure to reasonably protect their Personal Information; and

n.      Whether Plaintiffs and Class Members are entitled to damages or injunctive relief.

120.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Consistent with Rule 23(a)(3), Plaintiffs' claims are typical of those of other Class Members. Plaintiffs' Personal Information was in Defendant's possession at the time of the Data Breach and was compromised as a result of the Data Breach. Plaintiffs' damages and injuries are akin to other Class Members and Plaintiffs seek relief consistent with the relief of the Class.

121.    **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiffs are adequate representatives of the Class and respective Subclasses because Plaintiffs are members of the Class and respective Subclasses and are committed to pursuing this matter against Defendant to obtain relief for the Class and respective Subclasses. Plaintiffs have no conflicts of interest with the Class and Subclasses. Plaintiffs' counsel are competent and experienced in litigating class actions, including extensive experience in data breach and privacy litigation. Plaintiffs intend to

vigorously prosecute this case and will fairly and adequately protect the Class's and Subclasses' interests.

122.    **Predominance & Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Common issues in this litigation also predominate over individual issues because those issues discussed in the above paragraph on commonality are more important to the resolution of this litigation than any individual issues. The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiffs and the Class are relatively small compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be impracticable. Individual litigation by each Class Member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

123.    **Risk of Prosecuting Separate Actions.** This case is appropriate for certification because prosecuting separate actions by individual Class Members would create the risk of inconsistent adjudications and incompatible standards of conduct for Defendant or would be dispositive of the interests of members of the Class.

124.    **Ascertainability.** The Class and Subclass are defined by reference to objective criteria, and there is an administratively feasible mechanism to determine who fits within them.

The Class and Subclass consist of individuals whose information was supplied to Defendant. Class membership can be determined using Defendant's records—presumably also how Defendant was able to provide notice of breach letters to Class Members.

125.   **Injunctive Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive relief appropriate to the Class as a whole. Injunctive relief is necessary to uniformly protect Class Members' data. Plaintiffs seek prospective injunctive relief as a wholly separate remedy from any monetary relief.

126.   **Issues Class.** Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.   Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Personal Information;

b.   Whether Defendant failed to take commercially reasonable steps to safeguard the Personal Information of Plaintiffs and the Class Members;

c.   Whether Defendant was unfairly and unjustly enriched as a result of its improper conduct, such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiffs and the other Class Members; and

d.   Whether adherence to HIPAA regulations, FTC data security recommendations, industry standards, and measures recommended by data security experts would have reasonably prevented the Data Breach.

## CLAIMS FOR RELIEF

## COUNT 1

### NEGLIGENCE (On behalf of all Plaintiffs and all Class Members)

127.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1–136 as if fully set forth herein.

128.     Defendant required Plaintiffs and Class Members to submit Personal Information to itself to provide managed dental care services. Defendant collected and stored the Personal Information for commercial gain.

129.     Defendant knew or should have known that its systems were vulnerable to unauthorized access and exfiltration by third parties.

130.     Defendant had a non-delegable duty to maintain adequate and commercially reasonable data security practices to ensure the protection of its members' Personal Information.

131.     Defendant owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, securing, safeguarding, storing, and protecting Plaintiffs' and Class Members' Personal Information within its control from being compromised, lost, stolen, accessed, or misused by unauthorized persons.

132.     Defendant owed a duty of care to Plaintiffs and Class Members to provide security, consistent with industry standards, to ensure that the systems and networks Defendant utilized adequately protected their Personal Information.

133.     Defendant's duty to use reasonable security measures arose from the special relationship that existed between Defendant, and Plaintiffs and Class Members. The special relationship arose because Plaintiffs and Class Members entrusted Defendant with their Personal Information as part of their healthcare services. Only Defendant was in a position to ensure that it

had sufficient safeguards to protect against the harm to Plaintiffs and Class Members that would result from a data breach.

134.    Defendant's duty to use reasonable care in protecting Personal Information arose from the common law and the statutes and regulations, as well as its own promises regarding privacy and data security to patients. This duty exists because Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices. By collecting and maintaining the personal and confidential information of Plaintiffs and Class Members and acknowledging that this information needed to be kept secure, it was foreseeable that they would be harmed in the future if Defendant did not protect Plaintiffs' and Class Members' Personal Information from hackers like LockBit.

135.    Defendant's duties also arose under HIPPA regulations, which, as described above, apply to Defendant and establish national standards for the protection of patient information, including protected health information, which require Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1).

136.    Defendant's duties also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect personal and confidential information. Various FTC publications and data security breach orders further establish Defendant's duty.

137.     Defendant knew, or should have known, of the risks inherent in collecting and storing Personal Information, the vulnerabilities of its systems, and the importance of adequate security.

138.     Defendant breached its common law, statutory, and other duties—and thus was negligent—by failing to use reasonable measures to protect its members' Personal Information, and by failing to provide timely and adequately detailed notice of the Data Breach.

139.     Defendant breached its duties to Plaintiffs and Class Members in numerous ways, including by:

a.     Failing to exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect Plaintiffs' and Class Members' Personal Information;

b.     Failing to comply with industry standard data security standards during the period of the Data Breach;

c.     Failing to comply with regulations protecting the Personal Information at issue during the period of the Data Breach;

d.     Failing to adequately monitor, evaluate, and ensure the security of its network and systems;

e.     Failing to recognize in a timely manner that Plaintiffs' and other Class Members' Personal Information had been compromised; and

f.     Failing to timely and adequately disclose that Plaintiffs' and Class Members' Personal Information had been improperly acquired or accessed.

140.     Plaintiffs' and Class Members' Personal Information would not have been compromised but for Defendant's wrongful and negligent breach of its duties.

141.    Defendant's failure to take proper security measures to protect sensitive Personal Information of Plaintiffs and Class Members created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access of Plaintiffs' and Class Members' Personal Information.

142.    It was also foreseeable that Defendant's failure to provide timely and adequate notice of the Data Breach would result in injury to Plaintiffs and Class Members as described in this Complaint.

143.    Neither Plaintiffs nor the other Class Members contributed to the Data Breach and subsequent misuse of their Personal Information.

144.    As a direct and proximate cause of Defendant's conduct, Plaintiffs and Class Members suffered damages and will suffer damages including, but not limited to: damages arising from the unauthorized charges on their debit or credit cards or on cards that were fraudulently obtained through the use of the Personal Information of Plaintiffs and Class Members; damages arising from identity theft or fraud; damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives including, inter alia, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports and damages from identity theft, which may take years to discover and detect; and loss of the value of their privacy and confidentiality of the stolen confidential data, including health data.

## COUNT 2

### NEGLIGENCE PER SE (On behalf of all Plaintiffs and all Class Members)

145.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1–136 as if fully set forth herein.

146.    Defendant is an entity covered by HIPAA, 45 C.F.R. § 160.102, and as such is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

147.    HIPAA requires Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1).

148.    HIPAA further requires Defendant to disclose the unauthorized access and theft of the Personal Information to Plaintiffs and Class Members "without unreasonable delay" so that Plaintiffs and Class Members can take appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuse of their Personal Information. *See* 45 C.F.R. §§ 164.404, 406, & 410.

149.    Defendant violated HIPAA by failing to reasonably protect Plaintiffs' and Class Members' Personal Information, as described herein.

150.    Defendant's violations of HIPAA constitute negligence per se.

151.    Plaintiffs and Class Members are within the class of persons that HIPAA were designed to protect.

152.    The harm that occurred due to the Data Breach is the type of harm against which HIPAA were intended to guard.

153.    Additionally, Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by

businesses, such as Defendant, of failing to use reasonable measures to protect Personal Information. 15 U.S.C. § 45(a)(1).

154.    The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

155.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Personal Information and not complying with applicable industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of Personal Information it obtained, stored, and disseminated, and the foreseeable consequences of a data breach involving companies as large as MCNA, including, specifically, the immense damages that would result to Plaintiffs and Class Members.

156.    Defendant's violations of Section 5 of the FTC Act constitute negligence per se.

157.    Plaintiffs and Class Members are within the class of persons that the FTC Act were intended to protect.

158.    The harm that occurred due to the Data Breach is the type of harm against which the FTC Act were intended to guard. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm Plaintiffs and Class Members have suffered.

159.    As a direct and proximate result of Defendant's negligence per se, Plaintiffs and Class Members have suffered, continue to suffer, and will suffer, injuries, damages, and harm as set forth herein.

### COUNT 3

### BREACH OF IMPLIED CONTRACT (On behalf of all Plaintiffs and all Class Members)

160.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1–136 as if fully set forth herein.

161. In transacting with Defendant to receive managed dental care benefits and related services, Plaintiffs and Class Members entered into implied contracts with Defendant.

162. A material term of these implied contracts obligated Defendant to reasonably safeguard Plaintiffs' and Class Members' private health information, among other ways, by implementing reasonable security measures to prevent unauthorized intrusion into and disclosure of Plaintiffs' and Class Members' private health information.

163. Defendant breached this term of its implied contracts with Plaintiffs and Class Members by failing to implement reasonable security measures to safeguard Plaintiffs and Class Members' information.

164. As a direct and proximate result of Defendant's breach, Plaintiffs and Class Members have suffered, continue to suffer, and will suffer injuries, damages, and harm as set forth herein.

## COUNT 4

### BREACH OF CONFIDENCE (On behalf of all Plaintiffs and all Class Members)

165. Plaintiffs repeat and reallege the allegations contained in paragraphs 1–136 as if fully set forth herein.

166. Plaintiffs and Class Members maintained a confidential relationship with Defendant whereby Defendant undertook a duty not to disclose the Personal Information provided by Plaintiffs and Class Members to Defendant to any unauthorized third party or parties. Such Personal Information was confidential and novel, highly personal and sensitive, and not generally known.

167. Defendant knew Plaintiffs' and Class Members' Personal Information was being disclosed in confidence and understood the confidence was to be maintained, including by

expressly and implicitly agreeing to protect the confidentiality and security of the Personal Information they collected, stored, and maintained.

168.     Defendant required Plaintiffs and Class Members to provide their Personal Information to it in order to receive managed dental care services.

169.     As a result of the Data Breach, there was an unauthorized disclosure of Plaintiffs' and Class Members' Personal Information in intentional, knowing, and/or negligent breach of this duty. The unauthorized disclosure occurred because Defendant failed to implement and maintain reasonable safeguards to protect the Personal Information in its possession and failed to comply with industry-standard data security practices.

170.     Plaintiffs and Class Members were harmed by way of an unconsented disclosure of their confidential information to unauthorized third parties.

171.     As a direct and proximate result of Defendant's breach of confidence, Plaintiffs and Class Members suffered injury and sustained actual losses and damages as alleged herein. Plaintiffs and Class Members alternatively seek an award of nominal damages.

## COUNT 5

### UNJUST ENRICHMENT (On behalf of all Plaintiffs and all Class Members)

172.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1–136 as if fully set forth herein.

173.     For years and continuing to today, Defendant's business model depended upon patients entrusting them with their Personal Information. Trust and confidence are critical and central to both the services provided by Defendant to its members, and the billing and collection for such services. Unbeknownst to Plaintiffs and Class Members, however, Defendant failed to reasonably or adequately secure, safeguard, and otherwise protect Plaintiffs' and Class Members'

Personal Information. Defendant's deficiencies described herein were contrary to the information they provided to Plaintiffs and Class Members.

174.     Plaintiffs and Class Members engaged Defendant for services and provided Defendant with, and allowed Defendant to collect, their Personal Information on the mistaken belief that Defendant complied with its duty to safeguard and protect patients' Personal Information. Defendant knew that the manner in which it maintained patients' Personal Information violated its fundamental duties to Plaintiffs and Class Members by disregarding industry-standard security protocols to ensure confidential information was securely stored.

175.     Defendant had within its exclusive knowledge at all relevant times the fact that it had failed to implement adequate security measures to keep patients' Personal Information secure. This information was not available to Plaintiffs, Class Members, or the public at large.

176.     Defendant also knew that Plaintiffs and Class Members expected that their information would be kept secure against known security risks. Based on this expectation and trust, Defendant knew that Plaintiffs and Class Members would not have disclosed health information to it and would have chosen different service providers if Plaintiffs and Class Members knew those expectations were not met.

177.     Plaintiffs and Class Members did not expect that Defendant would store their Personal Information insecurely.

178.     Had Plaintiffs and Class Members known of Defendant's deficient security practices, Plaintiffs and Class Members would not have engaged Defendant to perform any services and would never have provided Defendant with their Personal Information.

179.     By withholding these material facts, Defendant put its own interests ahead of its members' interests and benefitted itself to the detriment of Plaintiffs and Class Members.

180. As a result of the conduct as alleged herein, Defendant sold more services than it otherwise would have and was able to charge Plaintiffs and Class Members when it otherwise could not have. Defendant were unjustly enriched by charging and collecting for those services to the detriment of Plaintiffs and Class Members.

181. To be sure, this is not a question of whether Defendant misused patients' Personal Information. It is more foundational. Defendant promised to protect and safeguard Plaintiffs' and Class Members' Personal Information at all times (from the inception of their relationship of trust and confidence) and never would have performed any services of value enabling it to bill or collect payment but for Defendant's unfair and deceptive practices.

182. It would be inequitable, unfair, and unjust for Defendant to retain these wrongfully obtained benefits. Defendant's retention of wrongfully obtained monies would violate fundamental principles of justice, equity, and good conscience.

183. Defendant's defective security and its unfair and deceptive conduct have, among other things, caused Plaintiffs and Class Members to unfairly incur substantial time and/or costs to mitigate and monitor the use of their private Personal Information.

184. Plaintiffs and each Class Member is entitled to restitution and non-restitutionary disgorgement in the amount by which Defendant was unjustly enriched.

### COUNT 6

### VIOLATION OF LOUSIANA DATABASE SECURITY BREACH NOTIFICATION LAW, LA. REV. STAT. §§ 51:3071–3077 (On behalf of Plaintiff Green and the Louisiana Subclass)

185. Plaintiff Green repeats and realleges the allegations contained in paragraphs 1–136 as if fully set forth herein.

186. The Louisiana Database Security Breach Notification Law, La. Rev. Stat. §§ 51:3071–3077, among other things required Defendant to notify Louisiana residents of the Data

Breach "in the most expedient time possible and without unreasonable delay but not later than sixty days from the discovery of the breach." La. Rev. Stat. § 51:3074(E).

187.    Defendant failed to disclose in a timely manner to Plaintiff Green and Louisiana Subclass members that there had been a breach of its security system resulting in the disclosure of Plaintiff Green's and the Louisiana Subclass's information.

188.    As a direct and proximate result of Defendant's failure, Plaintiff Green and Louisiana Subclass members have suffered, are suffering, and will continue to suffer actual damages.

## COUNT 7

## DECEPTIVE ACTS AND UNFAIR TRADE PRACTICES, FLA. STAT. §§ 501.204, 501.211 (On behalf of Plaintiff Mobini and the Florida Subclass)

189.    Plaintiff Mobini repeats and realleges the allegations contained in paragraphs 1–136 as if fully set forth herein.

190.    Plaintiff Mobini and Florida Subclass members are "person[s]" within the meaning of Fla. Stat. § 501.211(2).

191.    Defendant violated Fla. Stat. § 501.204 by engaging in unfair and deceptive acts or practices in the conduct of its trade or commerce in the State of Florida.

192.    Defendant's deceptive acts include omitting, suppressing, and concealing the material fact that it did not have and did not reasonably ensure that it reasonably or adequately secured Plaintiff Mobini's and Florida Subclass members' Personal Information.

193.    Defendant engaged in unfair and deceptive practices in connection with its accepting, collecting, securing, and otherwise protecting patient Personal Information, including:

a.      Failing to exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect Plaintiff Mobini's and Florida Subclass members' Personal Information;

b.      Failing to comply with industry standard data security standards during the period of the Data Breach;

c.      Failing to comply with regulations protecting the Personal Information at issue during the period of the Data Breach;

d.      Failing to adequately monitor, evaluate, and ensure the security of its network and systems;

e.      Failing to recognize in a timely manner that Plaintiff Mobini's and Florida Subclass members' Personal Information had been compromised; and

f.      Failing to timely and adequately disclose that Plaintiff Mobini's and Florida Subclass members' Personal Information had been improperly acquired or accessed.

194.    Plaintiff Mobini's and Florida Subclass members' Personal Information would not have been compromised but for Defendant's wrongful and unfair breach of its duties.

195.    Defendant's failure to take proper security measures to protect sensitive Personal Information of Plaintiff Mobini and Florida Subclass members created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access of Plaintiff Mobini's and Florida Subclass members' Personal Information.

196.    Plaintiff Mobini and Florida Subclass members conferred a benefit on Defendant— payment for medical services—in reliance on Defendant's omissions and deceptive practices. Had Defendant disclosed in any form, whether verbally, in writing, or via electronic disclosure that it

did not adequately secure patients' Personal Information, Plaintiff Mobini and Florida Subclass members would not have sought or purchased services from Defendant.

197.    As a direct and proximate result of Defendant's unfair and deceptive practices in violation of Fla. Stat. § 501.204, Plaintiff Mobini and Florida Subclass members have suffered losses, including loss of the benefit of their bargain with Defendant as they would not have paid Defendant for goods and services or would have paid less for such goods and services but for Defendant's violations alleged herein.

198.    Plaintiffs and Florida Subclass members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's fraudulent business practices or use of their Personal Information; reasonable attorneys' fees and costs under Fla. Stat. § 501.211; injunctive relief; and other appropriate equitable relief.

## PRAYER FOR RELIEF

199.    Plaintiffs ask the Court enter a judgment in their and Class Members' favor for

a.    permanent declaratory and injunctive relief to prohibit Defendant from continuing to engage in the unlawful acts, omissions, and practices described herein;

b.    compensatory, consequential, and general damages in an amount to be determined at trial;

c.    disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendant as a result of its unlawful acts, omissions, and practices, in amounts to be determined at trial;

d.    statutory damages, trebled, and punitive or exemplary damages, to the extent permitted by law;

e.    costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

  f.  pre- and post-judgment interest at the maximum legal rate; and

  g.  all such other relief as the Court deems just and proper.

## <u>JURY TRIAL DEMANDED</u>

 200. Plaintiffs demand a trial by jury of all claims in this Class Action Complaint so triable.

DATED: July 18, 2023      Respectfully submitted,

          VARNELL & WARWICK, P.A.
          */s/ Erika R. Willis*
          Janet R. Varnell; FBN: 0071072
          Brian W. Warwick; FBN: 0605573
          1101 E. Cumberland Ave., Ste. 201H, #105
          Tampa, FL 33602
          Telephone: (352) 753-8600
          Facsimile: (352) 504-3301
          jvarnell@vandwlaw.com
          bwarwick@vandwlaw.com
          ckoerner@vandwlaw.com

          Jason L. Lichtman
          jlichtman@lchb.com
          Sean A. Petterson
          spetterson@lchb.com
          LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
          250 Hudson Street, 8th Floor
          New York, NY  10013-1314
          Tel:  212-355-9500

          Ian R. Bensberg
          ibensberg@lchb.com
          LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
          275 Battery Street, 29th Floor
          San Francisco, CA  94111-3339
          Tel:  415-956-1000

          *Attorneys for Plaintiffs*